OPINION
{¶ 1} Plaintiffs-appellants, Oriana House, Inc. ("Oriana"), Correctional Health Services, Inc., and James J. Lawrence appeal from the judgment of the Franklin County Court of Common Pleas denying their motion for a temporary restraining order ("TRO") and preliminary injunction. For the following reasons, we affirm.
 {¶ 2} Community Based Correctional Facilities ("CBCF") are established pursuant to R.C. 2301.51 et seq. Currently, CBCF's are administered by local judicial corrections boards ("JCB") made up of members of local courts of common pleas, with funding approved and provided by the Ohio Department of Rehabilitation and Correction ("ODRC"). CBCF's primarily provide appropriate rehabilitative and corrections services to non-violent offenders. A CBCF receiving grant money must observe certain spending limits pursuant to a grant agreement.
 {¶ 3} Oriana is a non-profit corporation and the sole
entity contracted to operate the Summit County CBCF at issue. Therefore, Oriana receives 100 percent of the grant money provided by ODRC to the Summit County CBCF. Oriana is required to observe the spending limits set forth in the terms of the grants and must keep and provide documentation demonstrating its compliance. In 2001, Oriana received over $25 million for its operations. Approximately 88 percent of the $25 million was obtained from public sources. Correctional Health Services, Inc. ("CHS") is a for-profit wholly-owned subsidiary of Oriana that provides services to Oriana. During the pertinent audit period, James J. Lawrence ("Lawrence") was the president of both Oriana and CHS, and also the director of the Summit County CBCF.
 {¶ 4} In late January 2003, State Auditor, Betty Montgomery ("Montgomery"), announced her intention to conduct an audit of the Summit County CBCF and Oriana. The audit was initiated by Montgomery and was not requested by the JCB. Montgomery later issued four subpoenas requesting certain documents, including CHS' and Lawrence's bank records. At various times during the audit, Oriana has contested Montgomery's authority to conduct the audit and her right to subpoena certain documents. Montgomery asserts that pursuant to R.C. Chapter 117, she has the authority to undertake the subject audit as well as subpoena the above-mentioned bank records to examine the relationships and transactions of a variety of entities which either directly or indirectly operate or provide services to the Summit County CBCF. Specifically, Montgomery is examining the transactions between Oriana, CHS, and Lawrence to determine whether the grant funds were used in accordance with the terms of the grant agreements.
 {¶ 5} In 1999 and 2000, Oriana made two loans to CHS amounting to $6 million pursuant to two promissory notes. The loans represent almost one-fifth of Oriana's yearly operating budget. Montgomery is also aware of property transactions between Oriana and CHS. One transaction involves the sale and leaseback of property located in Akron, Ohio, where CHS purchased property from Oriana for $275,000 in 1985, and leased it back to Oriana. The lease payments from Oriana to CHS for years 1999, 2000, and 2001, total $840,278.
 {¶ 6} On September 12, 2003, plaintiffs filed a verified complaint for declaratory judgment and temporary, preliminary, and permanent injunctive relief against defendants Reginald Wilkinson, Director of ODRC, the Summit County JCB, Betty Montgomery as Auditor of State, and First Merit, N.A. On September 16, 2003, plaintiffs filed a motion for a TRO and preliminary injunction. Plaintiffs sought to enjoin Montgomery from (1) conducting a "special" audit of the CBCF, Oriana or its subsidiaries and affiliates; (2) conducting a "financial" audit of the CBCF, Oriana or its subsidiaries and affiliates except in accordance with H.B. 510; (3) assessing the costs of any audit upon the CBCF or Oriana or its subsidiaries and affiliates; (4) conducting any audit of the relationships and transactions between Oriana, CHS, Oriana Services, Inc., Lawrence and any other related parties; (5) issuing subpoenas to any third-party seeking production of Lawrence's bank records; (6) issuing, enforcing, or responding to the subpoena dated September 4, 2003, directly to First Merit; (7) publicly releasing or disclosing the documents subpoenaed on April 9, 2003, to First Merit and Key Bank and ordering the documents returned; and (8) issuing or enforcing future subpoenas directly to third-parties compelling the production of bank records or other documents of CHS or Lawrence.[1]
 {¶ 7} The trial court held Montgomery clearly had the authority to conduct the audit, even a "special" audit, pursuant to R.C. 117.01 et seq. The trial court further held that CBCFs are public offices subject to audits by Montgomery. Plaintiffs ("appellants") filed the instant appeal asserting the following six assignments of error:
[1.] The lower Court erred in failing to find that once public monies are paid to a contractor for services rendered, the public funds lose their character as "public monies" and the contractor is free to use that money for any reason it chooses.
[2.] The lower Court erred in failing to find that the State Auditor did not meet the three-part test enumerated in Petro v.North Coast Villas Limited (2000), 136 Ohio App.3d 93,735 N.E.2d 985 justifying the need to subpoena the production of bank records of a private third-party.
[3.] The lower Court erred in failing to require the State Auditor to disclose what specific evidence, if any, demonstrates that these records are relevant to the expenditure of public funds as was required by the Court in Petro v. North CoastVillas Limited (2000), 136 Ohio App.3d 93, 735 N.E.2d 985.
[4.] The lower Court erred in failing to find that the State Auditor does not have authority under R.C. 117.11(B) to conduct a "special audit" of the Summit County [CBCF] or of Plaintiff [Oriana], its subsidiaries and affiliates, or the relationships and transactions between Plaintiff [Oriana], [CHS], or [Lawrence], or any other related entities.
[5.] The lower Court erred in failing to find that the State Auditor has no lawful authority under R.C. 117.11(B) to assess the costs of either a "special" audit," financial" audit or "performance" audit upon the Summit County CBCF or upon Plaintiff [Oriana], its subsidiaries and affiliates.
[6.] The lower Court erred in failing to conduct an in camera
inspection of the documents requested and in failing to find that these bank records are confidential, proprietary, and trade secrets pursuant to R.C. 1333.61 et seq.
 {¶ 8} To grant a preliminary injunction, the court examines four factors: (1) whether there is a substantial likelihood that plaintiff will prevail on the merits; (2) the plaintiff will suffer irreparable injury if the injunction is granted; (3) no third parties will be unjustifiably harmed if the injunction is granted; and (4) the public interest will be served by the injunction. Vanguard Transp. Sys., Inc. v. Edwards Transfer Storage Co. (1996), 109 Ohio App.3d 786, 790, citing ValcoCincinnati, Inc. v. N D Machining Serv., Inc. (1986),24 Ohio St.3d 41. The party seeking the injunction must establish each element of the claim by clear and convincing evidence. Id.
 {¶ 9} In the first assignment of error, appellants argue that money initially characterized as "public money" for purposes of Chapter 117 loses its character as such once that money is paid to a contractor for services rendered. In the fourth assignment of error, appellants maintain Montgomery had no authority to conduct a "special" audit of the Summit County CBCF, Oriana and CHS under R.C. 117.11(B).[2] Because these two issues are intertwined and deal with Montgomery's overall authority, we address them together.
 {¶ 10} An audit is defined as any of the following:
(1) Any examination, analysis, or inspection of the state's or a public office's financial statements or reports;
(2) Any examination, analysis, or inspection of records, documents, books, or any other evidence relating to either of the following:
(a) The collection, receipt, accounting, use, or expenditure of public money by a public office or by a private institution, association, board, or corporation;
(b) The determination by the auditor of state, as required by section 117.11 of the Revised Code, of whether a public office has complied with all the laws, rules, ordinances, or orders pertaining to the public office;
(3) Any other type of examination, analysis, or inspection of a public office or of a private institution, association, board, or corporation receiving public money that is conducted according to generally accepted or governmental auditing standards established by rule pursuant to section 117.19 of the Revised Code.
R.C. 117.01 (Emphasis added.)
 {¶ 11} With respect to Montgomery's authority, R.C. 117.10
and 117.11 are relevant. R.C. 117.10 provides:
The auditor of state shall audit all public offices as provided in this chapter. The auditor of state also may audit the accounts of private institutions, associations, boards, and corporations receiving public money for their use and may require of them annual reports in such form as the auditor of state prescribes.
(Emphasis added.)
 {¶ 12} R.C. 117.11 provides:
(A) * * * the auditor of state shall audit each public office at least once every two fiscal years. * * * In the annual or biennial audit, inquiry shall be made into the methods, accuracy, and legality of the accounts, financial reports, records, files, and reports of the office, whether the laws, rules, ordinances, and orders pertaining to the office have been observed, and whether the requirements and rules of the auditor of state have been complied with. * * *
(B) In addition to the annual or biennial audit * * * the auditor of state may conduct an audit of a public office at any time when so requested by the public office or upon the auditor of state's own initiative if the auditor of state has reasonable cause to believe that an additional audit is in the public interest.
 {¶ 13} "* * * On its face, R.C. 117.10 requires the State Auditor to audit public agencies and grants [her] discretionary authority to audit those private entities receiving public monies." Petro v. North Coast Villas Limited (2000),136 Ohio App.3d 93, 98; State ex rel. Ministerial Day Care Assn. v.Petro, Cuyahoga App. No. 81895, 2003-Ohio-5635, affirmed100 Ohio St.3d 343. Montgomery's investigatory powers are broad and after the facts and circumstances surrounding the expenditure are fully developed, the auditor has a duty to determine whether public money has been illegally expended. Petro, supra, at 97; R.C. 117.28.
 {¶ 14} The first issue is whether CBCF and Oriana are public offices. Under R.C. 117.01(D), a public office is defined as "any state agency, public institution, political subdivision, other organized body, office, agency, institution, or entity established by the laws of this state for the exercise of anyfunction of government." (Emphasis added.) House Bill("Sub.H.B.") 510, which became effective March 31, 2003, amended R.C. 2301.56 and specifically included CBCFs as "public offices," subject to audit under R.C. 117.10. Further, private and non-profit entities performing the day-to-day operations of any CBCFs are subject to financial, and, in certain instances, performance audits under R.C. 117.10.[3] Appellants argue that Sub.H.B. 510 changed existing law and does not apply to the current audit.[4] Therefore, appellants contend Montgomery has no authority to undertake a special audit of Oriana or any related entities prior to the effectiveness of Sub.H.B. 510.
 {¶ 15} Even if Sub.H.B. 510 does not apply, we find the Summit County CBCF is a public office within the meaning of R.C.117.01(D). The legislature creates CBCFs under the auspices of ODRC. ODRC and Summit County directly fund CBCFs through grants of money. The Summit County CBCF expends public money for correctional purposes, clearly a function of government. Therefore, Montgomery has authority to audit the Summit County CBCF as a public office under R.C. 117.10. Pursuant to R.C.117.11(B), this authority extends to audits taken at Montgomery's own initiative, so long as it is in the public interest.[5]
 {¶ 16} The statute does not distinguish between, nor provide a definition for, a regular audit and a "special" audit. However, O.A.C. § 117-1-01 provides:
As used in Chapter 117 of the Revised Code and in Title 117 of the Administrative Code:
(A) "Audit" means an examination of financial statements, books, documents, records, and other evidence relating to the obligation, receipt, expenditure, or use of public money. An audit includes, but is not limited to, a special audit, financial audit, compliance audit, fraud and embezzlement audit, reviews of governmental operations, the performance of agreed-upon procedures, or any part or combination thereof.
 {¶ 17} Based on this section, a special audit is included within the definition of an audit. The Summit County CBCF was under scrutiny for alleged misuse of funds for nearly two years. It is in the public interest and indeed, it is Montgomery's duty to undertake an audit to determine whether such allegations are true and, if so, to act accordingly in recouping any illegally expended funds. Petro, supra. Accordingly, we find Montgomery has the authority to conduct a "special" audit under R.C.117.11(B). A special audit is simply a version of a "financial" audit undertaken at the auditor's own intiative.[6]
 {¶ 18} Oriana is a private non-profit corporation that contracted with the Summit County CBCF to provide 100 percent of the CBCF's day-to-day operations. According to appellants, the question becomes whether Oriana receives public money.[7]
Appellants argue that once the money changes hands from the public entity to the private entity, the money loses its character as public money and the public entity is no longer entitled to inquire how the money is expended. We find Oriana, while not a public office, is nonetheless subject to audit for two reasons.
 {¶ 19} First, we find R.C. 2301.56, as amended by Sub.H.B. 510, clearly provides for financial and performance audits of private institutions that perform the day-to-day operations of a CBCF, such as Oriana. As stated, appellants maintain the amendment does not apply to the audit in this case because SUB.H.B. 510 did not become effective until March 31, 2003,after Montgomery announced her intention to audit the Summit County CBCF and Oriana. Based on the record before us, we disagree with appellants.
 {¶ 20} On January 31, 2003, an article from The (Akron) Beacon Journal reported Montgomery's intention to conduct a special audit of Oriana. On February 3, 2003, Chief Deputy Auditor David A. Varda sent a letter to Oriana via its President, James J. Lawrence, notifying him of the need for a special audit. The letter further states "Kevin Saionzkowski ("Saionzkowski"), Chief Auditor of our Special Audits Section, * * * will be contacting you in the near future regarding the scheduling and scope of the special audit." However, it was not until April 25,2003 that the letter of arrangement was sent to the JCB and others, stating the nature and scope of the upcoming audit. In the opening paragraph it states: "This letter of arrangement between the Summit County [JCB], Summit County, * * * [Oriana], and the Auditor of State sets forth the nature and scope of the services we will provide during a special audit of the Summit County [CBCF/Oriana]." (Emphasis added.) Therefore, the audit did not begin until after March 31, 2003, the effective date of the amendment. Accordingly, we find R.C. 2301.56 as amended by Sub.H.B. 510 is applicable and specifically allows audits of private institutions performing the everyday operations of a CBCF.
 {¶ 21} Appellants argue that even if Sub.H.B. 510 applies to them, Montgomery's authority to audit Oriana and CHS is limited to a "financial" audit. The Ohio Revised Code ("ORC") does not differentiate between "special" audits, "financial" audits, and "performance" audits. However, based on the letters in the record, we find Montgomery's intent as to the scope of the audit of Oriana is clearly a financial one. That Montgomery called it a "special" audit initially has no bearing on the applicability of Sub.H.B. 510 to Oriana. The audit currently taking place is clearly financial and is specifically contemplated under current R.C. 2301.56. It, like R.C. 117.10, allows Montgomery to audit Oriana at her own initiative. Therefore, Montgomery has authority to conduct the financial audit of Oriana.
 {¶ 22} Second, since Sub.H.B. 510 applies, it is not necessary to address appellants' argument that Oriana somehow does not receive public money. However, we do so to avoid leaving any issue unaddressed. We find that under these facts, Oriana is a recipient of public money. Oriana is similar to the day care association subject to audit in Ministerial, supra.
 {¶ 23} In Ministerial, the day care association was a private, non-profit association that was a Head Start program for low-income families. Ministerial, supra. Ministerial received money from the Ohio Department of Education ("ODE") based on the Head Start program. In September 2000, the ODE requested that Montgomery perform a "special" audit to determine eligibility of the students under Head Start criteria. The Auditor ultimately determined that Ministerial received funding for more children than it could verify were enrolled in Head Start and had failed to pay private providers all the funds to which they were entitled. Ministerial challenged Montgomery's authority to conduct the special audit and issue subpoenas. The Supreme Court of Ohio rejected Ministerial's arguments. The court quotedPetro, supra, stating that Montgomery's investigatory powers are broad and articulated her duty to determine whether publicmonies had been illegally expended. Ministerial, supra, at 346.
 {¶ 24} Like Ministerial, Oriana is a private non-profit corporation performing a government function. Like Ministerial,
Oriana receives a large sum of money from public entities. Oriana receives 100 percent of the grant from ODRC based on its operation of the Summit County CBCF. Oriana is subject to the terms of that grant. Therefore, Oriana receives public money.
 {¶ 25} In sum, appellants' first assignment of error as to whether or not Oriana receives public money is overruled. Oriana is clearly a recipient of public money for its use. R.C. 117.10. Appellants' fourth assignment of error is similarly overruled. Pursuant to R.C. 117.11(B) as well as R.C. 2301.56 as amended by Sub.H.B. 510, Montgomery clearly has authority to audit the Summit County CBCF. Pursuant to R.C. 2301.56 as amended by Sub.H.B. 510, Montgomery has authority to audit Oriana based on its day-to-day operations of the CBCF. The scope of the audit is clearly financial and was contemplated under Sub.H.B. 510 as within her authority. Although this authority similarly extends to an audit of CHS as a wholly-owned subsidiary of Oriana, Montgomery is not currently auditing CHS.
 {¶ 26} In the second assignment of error, appellants argue the trial court erred in finding Montgomery met the three-part test enumerated in Petro justifying the subpoenas directed at third parties. In the third assignment of error, appellants maintain that Montgomery failed to show the documents requested in the subpoenas were relevant to the audit and expenditure of the grant money. Again, these two assignments of error are closely related and will be discussed together.
 {¶ 27} Montgomery's subpoena power is codified in R.C.117.18(A). That section provides:
The auditor of state and any employee designated by the auditor of state may, in the performance of any audit, issue and serve subpoenas and compulsory process or direct service thereof * * * compel the attendance of witnesses and the production of records, administer oaths, and apply to a court of competent jurisdiction to punish for disobedience of subpoena, refusal to be sworn, refusal to answer as a witness, or refusal to produce records. * * *
 {¶ 28} "An administrative agency charged with regulating and enforcing compliance with certain laws must be able to discover evidence in order to determine whether a law is being violated. To achieve this purpose, the scope of the agency's investigative power should be construed broadly, within statutory constraints."Harris v. Stutzman (1989), 42 Ohio St.3d 13, 14. "[T]he State Auditor's statutory subpoena power is in furtherance of this duty [to investigate expenditure of public funds]." Ministerial,
supra, citing Petro, supra. However, the authority to issue subpoenas is not unlimited. Id. A subpoena will be judicially enforced if: (1) the inquiry is permitted by law; (2) the records sought are relevant to the matter in issue; and (3) the records' disclosure will not cause unreasonable costs and difficulty.Petro, supra, citing State ex rel. Civ. Rights Comm. v. Gunn
(1976), 45 Ohio St.2d 262, 267.
 {¶ 29} The intent of Sub.H.B. 510 makes clear, and courts have previously held, the auditor's subpoena power extends to private third parties indirectly receiving money from a public agency as long as a relevant link exists between the public agency and the third party. Petro, supra; Ministerial, supra;State ex rel. Uguru v. Palaibis, Cuyahoga App. No. 81061, 2002-Ohio-2264. The Petro court found that the auditor must possess the ability to follow the money trail demonstrating a link between the public agency and the third party "[o]therwise, an underhanded public official could easily establish a web of conduits and launder public money without apprehension. In the interest of good government and maintaining the public trust, the State Auditor must be able to follow the money trail." Petro,
at 100; Uguru, supra (holding that auditor had authority to issue subpoenas to the private third-party company that contracted with an organization that received public money; company was required to disclose documents relating to contract as part of the audit).
 {¶ 30} We find the current inquiry to be permitted by law. Oriana receives public money from the Summit County CBCF through a grant from ODRC. CHS is a wholly-owned for-profit subsidiary of Oriana. Lawrence was the President of both entities at the relevant time. Montgomery must have the authority to subpoena documents in the possession of private third parties that indirectly receive money initially characterized as public money if a relevant link exists. To hold otherwise would allow individuals to receive grant money and use it however they see fit, with no regard as to whether the money is expended in accordance with law or a particular grant agreement. We do not hold that money intially characterized as public money is forever and always public money. In this case, however, there is more than a "relevant link" between the entities, Oriana owns CHS. Accordingly, we turn to whether the subpoenaed documents are relevant to the audit.[8]
 {¶ 31} Appellants argue the burden of establishing relevancy is on Montgomery. Regardless of whether the burden rests with Montgomery or appellants, we find the subpoenaed documents are clearly relevant to the audit insofar as they may assist Montgomery in determining whether Oriana complied with the terms of the grant agreements to which it is bound.
 {¶ 32} It should surprise no one, least of all Lawrence, that Montgomery is examining transactions between Oriana and CHS, as they do not appear to be arm's length transactions between independent entities. Moreover, it is difficult to understand how the governing boards of Oriana, CHS, and the Summit County CBCF missed the apparent conflict of interest arising from these transactions occurring while Lawrence concurrently served as President of both companies and Director of the CBCF.
 {¶ 33} Saionzkowski's affidavits confirm why the documents sought are needed. The financial records of CHS and Lawrence may provide information related to the expenditure of public money. As such, we do not find the production of these documents would be unreasonably costly or difficult.
 {¶ 34} Therefore, we find the three-part test set forth inPetro, supra, is satisfied. Montgomery (1) has the authority to conduct the audit of Oriana; (2) has the authority to subpoena documents in the possession of private third parties including CHS and Lawrence; and (3) the subpoenaed documents are relevant to determining whether Oriana complied with the terms of the grant agreements. Accordingly, appellants' second and third assignments of error are overruled.
 {¶ 35} In the fifth assignment of error, appellants assert the trial court erred in assessing the costs of the audit upon the Summit County CBCF or its subsidiaries or affiliates. The trial court held that because no costs have been assessed, any relief directed at the issue was premature. We agree. "The basic principle of ripeness may be derived from the conclusion that `judicial machinery should be conserved for problems which are real or present and imminent, not squandered on problems which are abstract or hypothetical or remote.'" State ex rel. ElyriaFoundry Co. v. Indus. Comm. (1998), 82 Ohio St.3d 88, 89.
 {¶ 36} In this case, Montgomery submitted a proposed letter of arrangement to Oriana in which Oriana would share the costs of the audit. However, Montgomery has not billed Oriana and has not attempted to actually assess costs in any way. Appellants' argument that Oriana is supposed to share costs is simply not a "real or present and imminent" problem for this court to resolve at this time. Therefore, we find that the issue is not ripe for adjudication. Accordingly, appellants' fifth assignment of error is overruled.
 {¶ 37} In the sixth assignment of error, appellants argue the trial court erred in failing to conduct an in camera inspection before determining whether the financial documents are confidential, proprietary trade secrets. The decision of whether or not to conduct an in camera inspection is within the trial court's discretion. Hanly v. Riverside Methodist Hosp. Found.,Inc. (1991), 71 Ohio App.3d 778; Doe v. Mt. Carmel HealthSys., Franklin App. No. 03AP-413, 2004-Ohio-1407. The trial court did not abuse its discretion in this case.
 {¶ 38} Appellants argue that once the audit report is issued, the requested documents, if retained by the auditor, will become public records. R.C. 117.26 provides:
Certified copies of completed audit reports shall be filed in the office of the clerk of the legislative authority, clerk of the governing body, executive officer of the governing body, and chief fiscal officer of the audited public office. * * * [A]n audit report is not a public record under section 149.43 of the Revised Code until copies of the report are filed with the officers enumerated in this section.
 {¶ 39} The audit report has not yet been issued. In turn, none of the so-called "trade secret" information has been disclosed. After the report is issued pursuant to R.C. 117.26, appellants may seek a protective order for any information appellants believe is exempt from disclosure under Ohio's public records law. The trial court would, at that time, likely conduct an in camera inspection. As stated above, the auditor has the authority to subpoena those documents relevant and necessary to the audit.
 {¶ 40} Further, appellants' argument that the financial information sought is protected as trade secrets is without merit. R.C. 1333.61(D) provides:
`Trade secret' means information, including the whole or any portion or phase of any * * * formula, * * * compilation, * * * method, technique, * * * or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
 {¶ 41} That which is generally proscribed under trade secret laws is the misappropriation of the information obtained from the person holding the trade secret, and later converted to the use and gain of the person obtaining the secret. Consumer Direct,Inc. v. Limbach (1991), 62 Ohio St.3d 180, 183. To constitute a trade secret, the information must be both unique and competitively advantageous. Wiebold Studio, Inc. v. Old WorldRestorations, Inc. (1985), 19 Ohio App.3d 246. Trade secrets are generally thought of as something that gives an employer a competitive advantage over another and as such are extremely coveted. Id.
 {¶ 42} For example, in Pyromatics, the court found that the manufacture of fused quartz products was a trade secret.Pyromatics, Inc. v. Petruziello (1983), 7 Ohio App.3d 131. The employee/defendant worked for the plaintiff/employer and learned the specifics of the product. The employee later started his own company manufacturing the same product and used cost figures to underbid the plaintiff on a project that the employee knew to be one of the plaintiff's major jobs. The court stated "[s]ince defendants learned the information necessary to compete with plaintiff while working for plaintiff under an agreement not to disclose trade secrets," an injunction was the proper remedy to enjoin defendant's use of the trade secrets. Id. at 137. (Emphasis added.) Similarly, customer lists, drivers' contracts, rate quotes, and schedules developed over 10 years of business were held to be trade secrets when a former employee took that information and went to work for a competitor. Vanguard, supra.
 {¶ 43} In this case, although the bank records of Oriana, CHS, and Lawrence are confidential and financial in nature, the information simply does not rise to the level of a trade secret. All businesses maintain financial records and most individuals have personal bank accounts. There is nothing unique about maintaining bank records. Normal, customary bank records do not contain information that if disclosed, would give competitors a business advantage over appellants. Again, at this point, disclosure to Montgomery does not render the documents public records. If there comes a time when the audit report did disclose some of this information, appellants may seek a protective order. Accordingly, appellants' sixth assignment of error is overruled.
 {¶ 44} However, we note, as did the trial court, that because some of the information is confidential and personal, a protective order preventing the release of this information should be worked out between the parties and presented to the trial court for its approval.
 {¶ 45} In conclusion, Montgomery has the authority to audit the Summit County CBCF as a public office. Montgomery has the authority to audit Oriana under R.C. 2301.56 as amended by Sub.H.B. 510, as well as the fact that Oriana is a recipient of public money and is thereby subject to audit under R.C. 117.10. A special audit of the Summit County CBCF is included within the definition of an audit. As to Oriana, Sub.H.B. 510 gives Montgomery the authority to conduct financial audits, clearly the nature of the audit at issue.
 {¶ 46} Montgomery also has the authority to subpoena private third parties that indirectly receive money from a public agency if there is a relevant link between the two. Here, Montgomery has established more than a relevant link between the Summit County CBCF, Oriana, CHS, and Lawrence. The subpoenaed information is clearly relevant to the transactions Montgomery is examining. Further, the bank records are not protected from disclosure as trade secrets and none of the information constitutes a public record at this time. If and when that time comes, if not agreed upon, appellants may seek a protective order. The issue of the cost of the audit is not ripe for adjudication since Montgomery has not yet attempted to actually assess any costs or collect.
 {¶ 47} Accordingly, appellants' first, second, third, fourth, fifth, and sixth assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
Petree and Sadler, JJ., concur.
[1] The four subpoenas requested the following information: (1) To First Merit Bank, in the name of Lawrence, all account signature information and/or records, copies of all bank statements for the period January 1, 1998, through the present, copies of deposit slips and supporting documents including checks, money orders, cashiers checks and cash in tickets for the period of January 1, 1998 through the present, and copies of all checks; (2) to Key Bank, the same information as requested to First Merit Bank; (3) to First Merit Bank, the same information except in the name of CHS; and (4) to American Express Company, all credit card statements for the period of January 1, 1998 through the present for Oriana (including all account numbers), Lawrence, CHS, and several other individuals.
[2] Montgomery is not attempting to audit CHS or Lawrence. Montgomery is only seeking documents from them to ensure Summit County CBCF's and Oriana's compliance with the grant terms.
[3] R.C. 2301.56 currently provides the following: "If a private or nonprofit entity performs the day-to-day operation of any [CBCF] and program, the private or nonprofit entity also is subject to financial audits under section 117.10 of the Revised Code, and, in addition, in the circumstances specified in this division, to performance audits by the auditor of state."
[4] The trial court found Sub.H.B. 510 merely clarified existing law.
[5] We also note that R.C. 2301.56, as amended by Sub.H.B. 510, specifically states that CBCFs are public offices for purposes of Chapter 117 and applies to this case for reasons discussed later in this opinion. Therefore, under either statute, the Summit County CBCF is a public office subject to audit by Montgomery.
[6] In a letter dated February 21, 2003, to Summit County Court of Common Pleas Judge Mary Spicer, Montgomery alluded to the difference between a performance audit and a special audit. Performance audits are less stringent and are essentially instituted to measure governmental efficiency. Special audits are necessary to examine financial documents to address allegations of fraud, theft, and misappropriation of money.
[7] Under R.C. 117.01(C), public money is defined as "any money received, collected by, or due a public official under color of office, as well as any money collected by any individual on behalf of a public office or as a purported representative or agent of the public office."
[8] Appellants argument with respect to three-part test enumerated in Petro, supra, deals with the issue of relevancy. There is no argument as to whether production of the requested documents would impose unreasonable costs and difficulty.