MOSSMAN, APPELLANT, *v.* DONAHEY ET AL., APPELLEES.

[Cite as Mossman v Donahey (1976), 46 Ohio St. 2d 1.]

(No. 75-222—Decided April 7, 1976.)

*Messrs. Vorys, Sater, Seymour & Pease, Mr. C. William O'Neill* and *Mr. Alan T. Radnor*, for appellant.

*Mr. William J. Brown*, attorney general, and *Mr. George Stricker, Jr.*, for appellees.

STERN, J. It is undisputed that the state was Nelson Souder's employer within the meaning of the 1966 amendment to the FLSA. The sole issue raised herein is whether the state may assert sovereign immunity as a defense to claims based upon federally-created rights under the FLSA, in an action brought by an individual in a state court. That issue is one which has been specifically left open by the United States Supreme Court in two recent cases.

In *Maryland* v. *Wirtz* (1968), 392 U. S. 183, the court held that minimum and overtime wage requirements of the FLSA were valid as exercises of the commerce power, and could constitutionally be applied to state-operated schools and hospitals. The court, however, at page 199, specifically reserved for future cases the question of "whether the Act violates the States' sovereign immunity from suit guaranteed by the Eleventh Amendment."

In *Employees* v. *Missouri Public Health Dept.* (1973), 411 U. S. 279, an action in federal court under the FLSA brought by employees of state health facilities, Justice Douglas' majority opinion stated that the language of the FLSA did not disclose a congressional purpose to deprive a state of its Eleventh Amendment immunty to suit in a federal court, and, therefore, the action was held to have been properly dismissed. The majority, at page 287, noted that Section 16(b) of the Act authorizes employee suits "in any court of competent jurisdiction," and stated that

this language "arguably" permits such suits in state courts, but did not reach that question.

Justice Marshall, joined by Justice Stewart, concurred. The concurrence argued that the common-law doctrine of sovereign immunity "was modifiied *pro tanto* * * * [when] the States relinguished their sovereignty to the Federal Government" (411 U. S. at 288), and that the states may not assert sovereign immunity to defeat a valid exercise of power by Congress under the Commerce Clause. The Eleventh Amendment, it was asserted, relates merely to " * * * the susceptibility of the States to suit before federal tribunals" (411 U. S. at 294), and would be no defense to a suit in a state tribunal. Justice Brennan, in a dissenting opinion, largely agreed with that argument but would have permitted the suit to be brought in federal court, because the Eleventh Amendment does not by its terms bar suits against a state by a citizen of that state. Further, at page 323, the dissent argued that the entire theory of sovereign immunity, "born of systems of divine right that the Framers [of the Constitution] abhorred," is incompatible with our constitutional system, in which the people, and not the states, are sovereign.

In a case on all fours with the present case, the Supreme Court of Tennessee adopted the reasoning of Justice Marshall, and held that an employees' suit against a state in that state's court was not barred by the defense of sovereign immunity. *Clover Bottom Hospital & School* v. *Townsend* (1974), 513 S. W. 2d 505. Contra, *Weppler* v. *School Board of Dade County* (Fla. App., 1975), 311 So. 2d 409.

The language of the Eleventh Amendment is simple and clear enough on its face, but the interpretation of that language and of the purpose underlying its framing has been a very different matter.

The Amendment states:

"The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citi-

zens of another State, or by Citizens or Subjects of any Foreign State.''

By its terms, the Amendment appears only to be a limitation upon the jurisdiction of federal courts to hear two sorts of cases. But the courts have never treated the Amendment in that fashion. It has been held that the immunity of the state under the Eleventh Amendment is ''a personal privilege which it may waive at pleasure'' (*Clark v. Barnard* [1883], 108 U. S. 436, 447), although logically a party may not ''waive'' a court's lack of judicial power. The Amendment has also been held to bar suits to which its language does not apply, *e. g.*, suits by a foreign power against a state, *Monaco v. Mississippi* (1934), 292 U. S. 313; suits by a corporation created by Act of Congress against a state, *Smith v. Reeves* (1900), 178 U. S. 446; suits against a state in admiralty, *Ex Parte State of New York* (1921), 256 U. S. 490, 497; and suits in which one state seeks relief on behalf of its citizens against another state, *New Hampshire v. Louisiana* (1883), 108 U. S. 76.

Again, the Amendment has been held to bar a suit prosecuted against a state, without its consent, by one of its own citizens. *Hans v. Louisiana* (1890), 134 U. S. 1; *Duhne v. New Jersey* (1920), 251 U. S. 311. All of these decisions grow from the unexpressed intent of the Amendment, rather than from its actual language. As Chief Justice Stone stated in *Monaco v. Mississippi, supra,* at pages 322-23:

''Manifestly, we cannot rest with a mere literal application of the words of §2 of Article III, or assume that the letter of the Eleventh Amendment exhausts the restrictions upon suits against nonconsenting states. Behind the words of the constitutional provisions are postulates which limit and control. There is the essential postulate that the controversies, as contemplated, shall be found to be of a justiciable character. There is also the postulate that States of the Union, still possessing attributes of sovereignty, shall be immune from suits, without their consent, save where there has been 'a surrender of this

6

immunity in the plan of the convention.' The Federalist, No. 81.''

These postulates find their source in the history both of the Constitution and of the circumstances surrounding the adoption of the Amendment, as the Supreme Court has pointed out on several occasions. *Edelman* v. *Jordon* (1974), 415 U. S. 651, 660-63; *Monaco* v. *Mississippi, supra,* at pages 323-25; *Hans* v. *Louisiana, supra,* at pages 10-16; *New Hampshire* v. *Louisiana, supra.*

Section 2, Article III of the United States Constitution provides that the judicial power shall extend, among other cases, "to controversies to which the United States shall be a party; to controversies between two or more States; between a State and Citizens of another State * * * and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.'' The effect of this grant of judicial power upon the traditional common-law principle of state sovereign immunity was a matter of concern and active debate in the state ratifying conventions. In the Virginia convention, Patrick Henry and others argued that the Judiciary Clause made the states suable in federal court, a prospect which could mean financial ruin to states which had issued Continental currency by then greatly depreciated or which had confiscated Tory property during the Revolutionary War.[1]

James Madison replied by asserting that the Judiciary Clause did not disturb the principle of sovereign immunity with regard to suits by individuals:

"Its jurisdiction in controversies between a state and citizens of another state is much objected to, and perhaps without reason. It is not in the power of individuals to call any state into court. The only operation it can have, is that, if a state should wish to bring a suit against a citizen, it must be brought before the federal court. * * *

" * * * It appears to me that this can have no opera-

---

[1]III Eliott, Debates in the Several State Conventions on the Adoption of the Federal Constitution, 318-19, 475-76; Jacobs, The Eleventh Amendment and Sovereign Immunity, 33.

tion but this—to give a citizen a right to be heard in the federal courts; and if a state should condescend to be a party, this court may take cognizance of it.'' III Elliot, Debates in the Several State Conventions on the Adoption of the Federal Convention, 533. John Marshall expressed the same view,[2] as did Hamilton, arguing in favor of the ratification of the Constitution in The Federalist No. 81 at page 602: ''It is inherent in the nature of sovereignty, not to be amenable to the suit of an indivdual *without its consent.* * * * Unless, therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the states, and the danger intimated must be merely ideal.''

The consensus that a state's sovereign immunity survived under the Judiciary Clause was not universal (hence the need for defenders of the Constitution to assert it), but it seems fair to say that the ratifiers of the clause were assured by the leading Federalists that they might rely upon the preservation of state sovereign immunity under the Constitution and that those assurances were in fact accepted by the ratifiers despite doubts and fears aroused by opponents of ratification.[3]

---

[2]Eliott, Debates, *supra*, at pages 555-56.

[3]One leading historian asserts:

''* * * The right of the Federal Judiciary to summon a State as defendant and to adjudicate its rights and liabilities had been the subject of deep apprehension and of active debate at the time of the adoption of the Constitution; but the existence of any such right had been disclaimed by many of the most eminent advocates of the new Federal Government, and it was largely owing to their successful dissipation of the fear of the existence of such Federal power that the Constitution was finally adopted * * *.'' 1 C. Warren, The Supreme Court in United States History (1922 Ed.), 91.

A contrary view is expressed, however, in Jacobs, The Eleventh Amendment and Sovereign Immunity, 40:

''On balance, the weight of expressed opinion seems to have been with those who believed, with either apprehension or satisfaction, that the states might be impleaded as defendants without their consent in suits instituted by citizens of other states and by foreign subjects in the federal courts. Whether the Constitution would have been ratified, in the absence of assurances that the states would not be suable, cannot be ascertained. But in any case, the legislative history of the Con-

Those doubts and fears quickly proved well-founded. The first suit entered in the Supreme Court at its August Term in 1791 was brought against the state of Maryland by a firm of Dutch bankers as creditors. *Vanstophorst* v. *Maryland* (1791), 2 Dall. 401, and 1 C. Warren, The Supreme Court in United States History, 91, fn. 1. Two years later, the issue of state immunity was directly presented in *Chisholm* v. *Georgia* (1793), 2 Dall. 419. That case was based upon a claim of delivery of war supplies to Georgia in 1777 for which no payment had been received.' The five participating justices delivered five separate opinions. Only Justice Iredell would have dismissed the actions, arguing that although the court had judicial power to hear the case, the Judiciary Act limited the exercise of that power to writs " 'agreeable to the principles and usages of law.' " To Justice Iredell, this language meant that federal judicial authority was dependent upon pre-existent laws and those passed under the Constitution. Since no such law restricted sovereign immunity, he asserted that the principle survived under the Constitution, and intimated his view that under no circumstances would a compulsive suit lie against the state for the recovery of money.

The other justices all held that the state was suable, either on the basis of the language of the Judiciary Clause which permitted states to be parties, or on the grounds that the states did not have the right of sovereignty in federal courts, having either surrendered it by adopting the Constitution or never having had it, on the theory that sovereignty had passed from the British crown to the people and thence to the federal and state governments as provided by the Constitution. Justice Wilson argued from

stitution hardly warrants the conclusion drawn by some that there was a general understanding, at the time of ratification, that the states would retain their sovereign immunity."

'The facts of the case were not officially reported. See Jacobs, *supra* , at page 47; 1 Goebel, History of the Supreme Court of the United States, 726.

general principles of justice and natural rights that states were not sovereign in the sense that they were immune from legal process, associating doctrines of sovereign immunity with despotic European governments. He concluded that the sovereign people had invested the federal courts with jurisdiction over the states.

Chief Justice Jay, in a similar argument, averred that the sovereignty of the nation was in the people of the nation, not, as in a feudal system, in the crown. He concluded that the state was suable, and that the Judiciary Clause extended to cases in which the state was a defendant as well as those in which it was a plaintiff. Any other rule, he contended "would contradict and do violence to the great and leading principles of a free and equal national government, one of the great objects of which is, to ensure justice to all." 2 Dall., at page 477.

The court's judgment and its rejection of state sovereign immunity "fell upon the country with a profound shock. Both the Bar and the public in general appeared entirely unprepared for the doctrine upheld by the Court, and their surprise was warranted, when they recalled the fact that the vesting of any such jurisdiction over sovereign States had been expressly disclaimed and even resented by the great defenders of the Constitution * * *." Warren, *supra,* at page 96. Two days after the decision was announced, a resolution was introduced in the Senate proposing a constitutional amendment and, with one slight change, that proposal became the Eleventh Amendment when it was finally ratified five years later.

The purpose of the Amendment was to overrule *Chisholm* and to reassert the principles of state sovereignty rejected in that decision. The immediacy of the furor aroused by the decision strongly indicates that the decision contravened the popular understanding of the relation of the states to the federal government. That explanation was urged upon the court by Attorney General Lee,[5] and ex-

*Hollingsworth* v. *Virginia* (1798), 3 Dall. 378.

pressly asserted a century later in *Hans* v. *Louisiana, supra.* In decisions since its formal ratification in 1798, the Supreme Court has construed the Eleventh Amendment in accordance with the expressed views of the Founding Fathers and of Justice Iredell in his dissent in *Chisholm*, as affirming that state sovereign immunity to suits by individuals is a constitutional right.[6]

In *Hans* v. *Louisiana, supra* (134 U. S. 1), it was held that a state may not be sued by one of its own citizens without its consent in federal court upon a federal question. The opinion examined the history of the Eleventh Amendment at length and concluded by approving the views expressed by Hamilton, Madison and Marshall:

''It seems to us that these views of those great advocates and defenders of the Constitution were most sensible and just; and they apply equally to the present case as to that then under discussion. The letter is appealed to now, as it was then, as a ground for sustaining a suit brought by an individual against a State. The reason against it is as strong in this case as it was in that. It is an attempt to strain the Constitution and the law to a construction never imagined or dreamed of. Can we suppose that, when the Eleventh Amendment was adopted, it was understood to be left open for citizens of a State to sue their own state in the federal courts, whilst the idea of suits by citizens of other states, or of foreign states, was indignantly repelled? Suppose that Congress, when proposing the Eleventh Amendment, had appended to it a proviso that nothing therein contained should prevent a State from being sued

---

[6] ''As to the States, legal irresponsibility was written into the Constitution by the Eleventh Amendment * * *.'' *Larson* v. *Domestic & Foreign Corp.* (1949), 337 U. S. 682, 708 (Frankfurter, J., dissenting):

''It may be accepted as a point of departure unquestioned, that neither a State nor the United States can be sued as defendant in any court in this country without their consent, except in the limited class of cases in which a State may be made a party in the Supreme Court of the United States by virtue of the original jurisdiction conferred on this court by the Constitution.'' *Cunningham* v. *Macon & Brunswick R. R. Co.* (1883), 109 U. S. 446, 451.

by its own citizens in cases arising under the Constitution or laws of the United States: can we imagine that it would have been adopted by the States? The supposition that it would is almost an absurdity on its face.

"The truth is, that the cognizance of suits and actions unknown to the law, and forbidden by the law, was not contemplated by the Constitution when establishing the judicial power of the United States." 134 U. S. at 14-15.

The opinion of the court concluded at page 21, with these words:

"It is not necessary that we should enter upon an examination of the reason or expediency of the rule which exempts a sovereign State from prosecution in a court of justice at the suit of individuals. This is fully discussed by writers on public law. It is enough for us to declare its existence. The legislative department of a State represents its polity and its will; and is called upon by the highest demands of natural and political law to preserve justice and judgment, and to hold inviolate the public obligations. Any departure from this rule, except for reasons most cogent, (of which the legislature, and not the courts, is the judge,) never fails in the end to incur the odium of the world, and to bring lasting injury upon the State itself. But to deprive the legislature of the power of judging what the honor and safety of the State may require, even at the expense of a temporary failure to discharge the public debts, would be attended with greater evils than such failure can cause."

The reasoning and the holding of the court in *Hans* has frequently been approved and followed by the court. *Smith* v. *Reeves* (1900), 178 U. S. 436; *Duhne* v. *New Jersey, supra* (251 U. S. 311); *Monaco* v. *Mississippi, supra* (292 U. S. 313). See, also, *Williams* v. *United States* (1933), 289 U. S. 553, 574-77. The basis of that reasoning is that state sovereign immunity is a right of constitutional proportions, whether it is considered to derive from the plan of the Constitution itself, or from the Eleventh Amendment after the contrary decision in *Chisholm*. That right

does not apply to the cases specified in Section 2, Article III of the United States Constitution which extends the judicial power "to controversies to which the United States shall be a Party" and "to controversies between two or more States," for in those cases the federal plan of the Constitution would be defeated if the states could assert sovereign immunity against other states or the United States, sovereignties of an equal or superior degree in our federal system. The states are necessarily presumed to have surrendered those attributes of sovereignty. See *United States v. California* (1936), 297 U. S. 175.

On the other hand, as to suits by individuals against a state, the plan of the Constitution envisions no such surrender of sovereign immunity, as demonstrated by the statements of the Founding Fathers, the passage of the Eleventh Amendment, and the language of numerous decisions of the Supreme Court.

Some recent opinions of the court have, however, called into question this traditional interpretation of state sovereign immunity and the Eleventh Amendment, either by finding an "implied waiver" deriving from state activity in a federally regulated field or by reevaluating the theoretical and historical bases of sovereign immunity and the Eleventh Amendment.

In *Petty* v. *Tennessee-Missouri Bridge Comm.* (1959), 359 U. S. 275, suit was brought under the Jones Act to recover damages for a death allegedly caused by the negligence of a commission created by the states of Missouri and Tennessee with the approval of Congress pursuant to the Compact Clause of the Constitution. (Article I, Section 10).[7]

The court held that, by the inclusion of a term in the compact authorizing the commission "to sue and be sued," and by state acceptance of a congressional proviso that retained federal rights over commerce and navigable waters, the states waived whatever immunity from suit the

---

[7]"No State shall, without the consent of Congress * ** enter into any agreement or compact with another State * * *."

commission might have enjoyed under the Eleventh Amendment.

The doctrine of implied waiver, applied in *Petty* to the interpretation of a state compact and an act of Congress, was expanded in *Parden* v. *Terminal Ry. of Alabama* (1964), 377 U. S. 184, to a federal court suit by employees of a state-owned railroad brought against the state under the Federal Employers' Liability Act. The case is also significant because, as the opinion states, "for the first time in this Court, a State's claim of immunity against suit by an individual meets a suit brought upon a cause of action expressly created by Congress" (377 U. S. 187),[s] and the court held that the suit could be maintained against the state in a federal court. Yet, Mr. Justice Brennan, who delivered the opinion, has admitted that the holding in *Parden* was "perhaps not unambiguously phrased" (*Employees* v. *Missouri Public Health Dept., supra*, at 301, Brennan, J., dissenting), and subsequent cases have distinguished *Parden* on its facts. *Employees* v. *Missouri Public Health Dept., supra; Edelman* v. *Jordan* (1974), 415 U. S. 651.

On the one hand, *Parden* disagreed with the contention "that Congress is without power, in view of the immunity doctrine, thus, to subject a State to suit" (377 U. S. at 190), and stated, at page 192, that "[b]y empowering Congress to regulate commerce, * * * the States necessarily surrendered any portion of their sovereignty that would stand in the way of such regulation." Under this theory, the states would have no right of sovereign immunity to any action brought by an individual under federal law within the Commerce Clause (or, presumably, within any other constitutonal grant of federal authority). The court did not mention the drastic change in interpretation of the Eleventh Amendment thus suggested, but relied upon *Unit-*

___

[s]The *Hans* case involved claims upon state bond coupons, and the plaintiff alleged that the default of the state was an impairment of the obligation of contract. See *Parden, supra*, at 186-87.

*ed States* v. *California* (1936), 297 U. S. 175, which held that a state's operation of a railroad in interstate commerce was in subordination to the plenary federal power to regulate commerce. But *California* did not involve the Eleventh Amendment or sovereign immunity. It was an action by the United States against a state, and a state may assert no immunity in such a case. *Parden* thus gave no consideration to whether the commerce power is limited by the Eleventh Amendment or the plan of the Constitution, so as to bar Congress from compelling the states to answer suits by individuals, even though those suits be based upon rights created as proper regulations of commerce. The federal government may of course enforce such rights against the states in its own name, but the effect of this language in *Parden* would be that it might also, in effect, "lend" its right and sovereignty to individuals.

Yet it is not clear that this in fact is the rationale of *Parden*. The court went on to state that it was not overriding the immunity doctrine embedded in the Eleventh Amendment. "* * * It remains the law that a State may not be sued by an individual without its consent. Our conclusion is simply that Alabama, when it began operation of an interstate railroad approximately 20 years after enactment of the FELA necessarily consented to such suit as was authorized by that Act." 377 U. S. at 192. Obviously, this latter rationale is directly contradictory to any theory that the states surrendered their immunity in granting Congress power to regulate commerce.

That contradiction has not been resolved by later cases, and the holding in *Parden* remains, in consequence, unclear. In *Employees, supra, Parden* was distinguished as involving "dramatic circumstances * * * which involved a rather isolated state activity * * *." 411 U. S. at 285. In *Edelman* v. *Jordan, supra*, the court again left open the question of whether congressional authorization of suit or state waiver of immunity is the fundamental test in suits based upon federal rights, distinguishing *Parden* and *Petty* on the basis of differences in statutory language.

It may well be that the trend in the court's decisions is away from the traditional interpretation of the Eleventh Amendment. The concurrence and dissent in *Employees* argue that the letter of the amendment should control and, though that argument has been oft rejected by the court, it may be that its day has arrived. The principle of sovereign immunity has come under increasng attack and appears to many an anachronistic remnant of obsolete political theories. *Employees, supra,* (Brennan, J., dissenting); *Krause* v. *State* (1972), 31 Ohio St. 2d 132, 149, 285 N. E. 2d 736, 746 (Brown, J., dissenting). See, also, *Larson* v. *Domestic & Foreign Corp., supra* (337 U. S. 682), at pages 708-09 (Frankfurter, J., dissenting). In the case at bar, this "theory" might well be seen as frustrating progressive efforts to assure fundamental human rights of mentally retarded persons committed to state institutions.

Yet the intent of the framers of the Constitution and the long course of judicial decision appear to establish that such suits as the one at bar are dependent upon the consent of the state under the Constitution, and the recent decisions of the high court give no compelling indication to the contrary. Under the traditional interpretation, an underlying postulate of the Eleventh Amendment is that the state may not be sued by individuals without its consent, and that "[u]nless, therefore, there is a surrender of this immunity in the plan of the * * * [Constitution], it will remain with the state * * *." The Federalist No. 81, at page 602. The arguments that state sovereignty is incompatible with natural justice and our federal system of government are not new ones, for they were advanced by the majority in *Chisholm, supra* (2 Dall. 419), and, it appears, rejected by the passage of the Eleventh Amendment, for good or ill.

To permit the present suit to be maintained against the state without its consent would be to permit even greater intrusion upon state sovereignty than in *Chisholm*. In *Chisholm,* the court held that the states could be compelled to appear before the Supreme Court in a suit brought by

a citizen of another state upon a claim of debts incurred by the state. To permit the instant case would be to hold that the federal government may create a cause of action against a state without the state's consent (or with its "implied" consent), compel the state to appear as a party in its own state courts, and, if the state is successful there, be subject to appear before the Supreme Court on appeal because the case involves a federal question. Section 1257, Title 28, U S. Code. The language of the court in *Hans*, cited *ante* at page 16, applies even more forecfully here than in that case:

"Suppose that Congress, when proposing the Eleventh Amendment, had appended to it a proviso that nothing therein contained should prevent a State from being sued by its own citizens in cases arising under the Constitution or laws of the United States: can we imagine that it would have been adopted by the States? The supposition that it would is almost an absurdity on its face." 134 U. S. at page 15.

If the Eleventh Amendment creates or affirms a substantive state right of sovereign immunity, as the court has often stated, rather than a "hypertechnical" right for a state to choose a state forum, as Mr. Justice Marshall argues, then that right, to have any substantive effect, must be as applicable in a state forum as in a federal one.

It is likely that the framers of the Constitution never contemplated the possibility that Congress could create for individuals rights enforceable by damages against the states. The creation of such rights raises significant and difficult questions of federal-state relationships, and it is these questions with which the Supreme Court has been grappling in recent cases. It may well be the emerging law that with regard to matters which are fundamentally outside the traditional scope of state government, the states are not protected, by the shield of the Eleventh Amendment, from suits by individuals asserting federally created rights. The same considerations which have been applied to questions of state immunity from federal taxation, in

order to secure ""* * * accommodation of the competing demands for national revenue, on the one hand, and for reasonable scope for the independence of state action on the other,'" may well apply to accommodate the competing demands of federal policies (requiring private suits against states to be effective), and of the traditional state right to protect its treasury by determining whether it consents to suit.

The concern expressed by the court in *Employees* with extending the holding in *Parden* to an area with such "manifold applications" as are involved in the instant case indicates a clear recognition of the problems involved in this area of law.[10] This same recognition was again expressed by the court in *Edelman* v. *Jordan, supra,* which, at page 663, held that "a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment" and that therefore the amendment acted as a bar to retroactive payment of benefits found to have been wrongly withheld by state officials administering a federal-state welfare program.

It appears to this court to remain the law under the Eleventh Amendment that a state may not be sued for damages by an individual under federal law, without its consent, and that this principle applies equally to state as well as federal courts.[11]

This right may well be a limited one in areas of pri-

[9]*Helvering* v. *Gerhardt* (1938), 304 U. S. 405, 416. See, Note, 50 Notre Dame Lawyer 496, 506 (1975).

[10]The extent of these applications goes beyond even employees in the same position as the plaintiff in this case, for the statute under which this action is brought, Section 203, Title 29, U. S. Code *et seq.*, was amended, effective the day after this suit was filed, to include virtually all state employees except elected officials and their staffs. Sections 6(a) (1, 2) and 29(a) of P. L. 93-259, amending Sections 203(d) and (e), Title 29, U. S. Code.

[11]Since this suit was filed, the Ohio General Assembly has enacted R. C. Chapter 2743, waiving the state's immunity from liability and consenting to be sued in the Court of Claims.

marily federal concern and regulation, and in those areas the states may be subject to private suits in the same manner as individuals, where Congress has so provided. In this case, however, the majority in *Employees*, at page 285, stated that they had "found not a word in the history of the 1966 Amendments to indicate a purpose of Congress to make it possible for a citizen of that State or another State to sue the State in the federal courts," and held that "Congress did not lift the sovereign immunity of the States under the FLSA."[12]

For the reasons cited above, and under the line of cases deriving from *Hans* v. *Louisiana, supra* (134 U. S. 1), it is our conclusion that state sovereign immunity applies equally to state as well as federal courts; that the holding in *Employees, supra* (411 U. S. 279), applies to bar this action; and that this action was therefore properly dismissed by the courts below.

*Judgment affirmed.*

P. Brown, acting C. J., Herbert, Corrigan, Celebrezze, W. Brown and Cole, JJ., concur.

Cole, J., of the Third Appellate District, sitting for O'Neill, C. J.

William B. Brown, J., concurring. Despite my natural aversion to the concept of "sovereign immunity" (see, *e. g.*, my dissenting opinion in *Thacker* v. *Bd. of Trustees of Ohio State Univ.* [1973], 35 Ohio St. 2d 49, 66), I join with

---

[12]The majority in *Employees* also noted that the provisions of the FLSA could be given effect by the Secretary of Labor, through suits against the states to enjoin violations of the Act and to obtain restitution in behalf of employees. 411 U. S. at 285-86. States are not immune from all federal regulation under the Commerce Clause because of their sovereign status, and the Eleventh Amendment does not limit direct suits by the federal government against states in order to enforce such regulations. See *Fry* v. *United States* (May 27, 1975), 421 U. S. 542, 44 L. Ed. 2d 363.

the majority to protest what constitutes, in my opinion, an incredible federal intrusion into internal state affairs.

Appellant presents the somewhat plausible assertion that "employees of state institutions for the mentally retarded [have] the right to sue their employers [the states] to recover unpaid minimum wages." However, through bureaucratic interpretation of the Fair Labor Standards Act and a ruling of a federal tribunal in Washington, D. C. (*Souder* v. *Brennan* [D. D. C., 1973] 367 F. Supp. 808), mental patients, who perform any work of "consequential economic benefit," have been deemed employees entitled to the minimum wage.

Allegedly, " [t]he result has been the elimination of patient work, a valuable form of therapy, because the institutions cannot begin to pay the minimum wage and overtime now required. * * * Most institutions simply phased out patient work, leaving former patient workers idle and pathetic victims of bureaucracy." Lebar, Worker-Patients: Receiving Therapy or Suffering Peonage? 62 A. B. A. J. 219 (February 1976.)

Before states venture too far down the road to abdicating their traditional functions, the federal Constitution should be consulted. The majority opinion finds the Eleventh Amendment to be a preserver of amicable federal-state relationships. See, also, Durchslag, Welfare Litigation, The Eleventh Amendment and State Sovereignty: Some Reflections on *Dandridge* v. *Williams,* 26 Case Western Reserve L. Rev. 60 (Fall 1975). Justice Rehnquist, in his splendid dissenting opinion in *Fry* v. *United States* (1975), 421 U. S. 542, 549-559, 44 L. Ed. 2d 363, 370-376, has explored the message of the Tenth Amendment, which reads:

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

The situation herein presented is neither a federal program being administered by the states nor a state program greatly dependent upon the federal fisc. Rather, it is a state activity like the administration of prisons, which *historical-*

*ly* has been an *exclusive state function* under the reserved powers of the Tenth Amendment. *Carter* v. *McGinnis* (W. D. N. Y., 1970), 320 F. Supp. 1092, 1093; *Rose* v. *Haskins* (C. A. 6, 1968), 388 F. 2d 91, 93, certiorari denied, 392 U. S. 946; *United States* v. *Jones* (S. D. Fla., 1952), 108 F. Supp. 266, 269, remanded on other grounds, 345 U. S. 377, reversed on other grounds, 207 F. 2d 785; *Siegel* v. *Ragen* (C. A. 7, 1950), 180 F. 2d 785, 788, certiorari denied, 339 U. S. 990. See, also *Dixon* v. *Steele* (W. D. Mo., 1951), 104 F. Supp. 904, 908 ("* * * the right to confine persons for insanity is reserved to the states * * *"); *Fahey* v. *United States* (S. D. N. Y., 1957), 153 F. Supp. 878, 884 ("The federal government has no constitutional or inherent power to commit [mentally incompetent persons]").

The stakes of this action are not only substantial state revenues, but also state policy choices of compelling magnitude. As stated by Justice Rehnquist in his dissenting opinion in *Fry, supra*, (44 L. Ed. 2d, at 375) "[b]oth [the Tenth and Eleventh] Amendments are simply examples of the understanding of those who drafted and ratified the Constitution that the States were sovereign in many respects, and that although their legislative authority could be superseded by Congress in many areas where Congress was competent to act, Congress was nonetheless not free to deal with a state as if it were just another individual or business enterprise subject to regulation."

For the foregoing reasons, appellant's complaint was properly dismissed by the trial court because it fails to state a claim upon which relief can be granted. Civ. R. 12(B) (6).

CELEBREZZE, J., concurs in the foregoing concurring opinion.