THE STATE EX REL. ORIANA HOUSE, INC., APPELLANT,
*v.* MONTGOMERY, AUD., APPELLEE.

[Cite as *State ex rel. Oriana House, Inc. v. Montgomery,*
110 Ohio St.3d 456, 2006-Ohio-4854.]

(No. 2005–1505—Submitted February 21, 2006—Decided October 4, 2006.)

PFEIFER, J.

{¶ 1} This is an appeal from a judgment granting a writ of mandamus to compel a private, nonprofit corporation to provide access to certain records under the Public Records Act, R.C. 149.43. For the reasons that follow, we reverse the judgment. The writ is denied.

## I. Community–Based Correctional Facilities and Programs

{¶ 2} Under R.C. 2301.51(A)(1), "[t]he court of common pleas of any county that has a population of two hundred thousand or more may formulate a community-based correctional proposal that, upon implementation, would provide a community-based correctional facility and program ['CBCF'] for the use of that court in accordance with sections 2301.51 to 2301.56 of the Revised Code." Each "county's community-based correctional facilities and programs shall be administered by a judicial corrections board ['JCB']," which is comprised of judges of the common pleas court. R.C. 2301.51(A)(1). As of August 2004, there were 18 CBCFs operating in Ohio pursuant to R.C. 2301.51(A)(1).

{¶ 3} A JCB must submit its proposal for the establishment of a CBCF to the Division of Parole and Community Services of the Ohio Department of Rehabilitation and Correction ("ODRC"). R.C. 2301.51(B)(1). If the ODRC approves the proposal, the JCB "may establish and operate the facility and program addressed by the proposal" and may request funding from the board of county commissioners and the ODRC. R.C. 2301.51(C) and 2301.56(A). The proposal must meet certain minimum standards, including a general treatment program and the designation of a facility that will be used for the confinement of persons sentenced to the facility. R.C. 2301.52.

{¶ 4} CBCFs are "public offices under section 117.01 of the Revised Code and are subject to audit under section 117.10 of the Revised Code." R.C. 2301.56(E)(1). "If a private or nonprofit entity performs the day-to-day operation of any [CBCF] * * *, the private or nonprofit entity also is subject to financial audits under section 117.10 of the Revised Code, and, in addition, in [certain] circumstances * * *, to performance audits by the auditor of state." Id.

{¶ 5} In 1987, the judges of the Summit County Court of Common Pleas formed the Summit County JCB and submitted a proposal to the ODRC to operate a CBCF for Summit County. The ODRC approved the proposal. The Summit County JCB contracted with appellant, Oriana House, Inc., to operate the Summit County CBCF.

{¶ 6} Oriana House is a private, nonprofit Ohio corporation that was first incorporated in 1981. Oriana House has a six-member board of directors; none of the directors holds public office. Oriana House receives all of the state funding granted to the Summit County CBCF by the ODRC. In 2001, Oriana House had over $25 million in income, approximately 88 percent of which was

from public sources. Summit County JCB has permitted Oriana House to operate the CBCF without oversight.

{¶ 7} Since 1981, James J. Lawrence has served as president and chief executive officer of Oriana House, and for at least a few years, he also served as director of the Summit County CBCF. Lawrence signed the Summit County CBCF grant application for fiscal years 2002 and 2003 in his capacity as director of the Summit County CBCF. Summit County CBCF's grant application for fiscal year 2005 was signed by Judge Mary F. Spicer, chairperson of the Summit County JCB. The grantee is the Summit County CBCF.

## II. Audit of Oriana House

{¶ 8} In January 2003, appellee, State Auditor Betty Montgomery, announced her intention to conduct a special audit of the Summit County CBCF and Oriana House. Montgomery was investigating transactions between Oriana House, Lawrence, and Correctional Health Services, Inc., a for-profit, wholly owned subsidiary of Oriana House. Oriana House, its wholly owned subsidiary, and Lawrence sought declaratory and injunctive relief against several defendants, including Montgomery, in the Franklin County Court of Common Pleas. Oriana House moved to enjoin Montgomery from conducting special audits of the Summit County CBCF, Oriana House, its subsidiary, and Lawrence, and from issuing subpoenas seeking bank records or other documents of Lawrence or Correctional Health Services, Inc. The trial court denied the motion. On appeal, the court of appeals affirmed. *Oriana House, Inc. v. Montgomery,* Franklin App. No. 03AP–1178, 2004-Ohio-4788, 2004 WL 2008473. The court of appeals held that Oriana House, "while not a public office, is nonetheless subject to audit." Id. at ¶ 18. We affirmed that portion of the court of appeals judgment, holding that Montgomery has the authority to conduct a special audit of Oriana House. *Oriana House, Inc. v. Montgomery,* 108 Ohio St.3d 419, 2006-Ohio-1325, 844 N.E.2d 323.

## III. Records Requests and Mandamus Claims

{¶ 9} Oriana House requested access to certain records relating to Montgomery's audit under R.C. 149.43, Ohio's Public Records Act. Montgomery provided full or partial access to some records and denied access to others.

{¶ 10} In May 2004, Oriana House filed complaints in the Court of Appeals for Franklin County for a writ of mandamus to compel Montgomery to provide access to the requested records. The court of appeals consolidated Oriana House's cases.

{¶ 11} On March 31, 2004, Montgomery requested that Oriana House provide access to personnel files for certain Oriana House employees, including Lawrence, records and supporting documents of transactions between Oriana House

and certain entities and Lawrence, records identifying accounts used by Oriana House, and travel reports for certain persons. On April 13, 2004, Montgomery reiterated her previous records request and also asked for certain records relating to contract and state employees.

{¶ 12} Oriana House rejected Montgomery's requests, claiming that it was not required to produce the requested records because it is not a public office as defined in R.C. Chapter 149. On June 4, 2004, Montgomery filed her answer to Oriana House's consolidated mandamus cases and submitted a counterclaim for a writ of mandamus to compel Oriana House to provide access to the requested records.[1]

{¶ 13} The court of appeals entered a judgment granting in part and denying in part Oriana House's and Montgomery's requests for writs of mandamus. The court of appeals held that Montgomery was entitled to a writ of mandamus to compel Oriana House to provide access to the requested records concerning its operation of the Summit County CBCF because Oriana House is a public institution and thus a public office for purposes of the Public Records Act.

{¶ 14} This cause is now before us upon Oriana House's appeal as of right.

## IV. R.C. 149.43

{¶ 15} The court of appeals granted Montgomery's request for a writ of mandamus to compel Oriana House to provide access to the requested records, including certain employee personnel files, under R.C. 149.43. "Mandamus is the appropriate remedy to compel compliance with R.C. 149.43, Ohio's Public Records Act." *State ex rel. Dispatch Printing Co. v. Johnson,* 106 Ohio St.3d 160, 2005-Ohio-4384, 833 N.E.2d 274, ¶ 16. "We construe R.C. 149.43 liberally in favor of broad access and resolve any doubt in favor of disclosing records." *State ex rel. Plain Dealer Publishing Co. v. Cleveland,* 106 Ohio St.3d 70, 2005-Ohio-3807, 831 N.E.2d 987, ¶ 20.

{¶ 16} We must determine whether the court of appeals was correct in its determination that Oriana House, a private, nonprofit corporation managing the day-to-day operations of the Summit County CBCF, is a public office for purposes of the Public Records Act. " 'Public record' means records kept by any public office." R.C. 149.43(A)(1). " 'Public office' includes any state agency,

---

1. Montgomery's counterclaim included requests for records relating to the Seneca County CBCF and Automatic Data Processing, Inc., a company with whom Oriana House contracted to manage its payroll processing for the Summit County and Seneca County CBCFs. Because this appeal involves only those records relating to Oriana House's operation of the Summit County CBCF, our analysis is similarly limited.

public institution, political subdivision, or any other organized body, office, agency, institution, or entity established by the laws of this state for the exercise of any function of government." R.C. 149.011(A). Montgomery does not assert that Oriana House is a state agency, political subdivision, or other organized body, office, agency, institution, or entity established by the laws of this state for the exercise of any function of government. Instead, Montgomery contends—and the court of appeals held—that Oriana House is a "public institution" under R.C. 149.011(A) and is thus subject to R.C. 149.43.

## V. Public Institutions

{¶ 17} In *State ex rel. Fox v. Cuyahoga Cty. Hosp. Sys.* (1988), 39 Ohio St.3d 108, 529 N.E.2d 443, we first addressed the question of what constitutes a public institution for purposes of the Public Records Act. In that case, we held that "[a] public hospital, which renders a public service to residents of a county and which is supported by public taxation, is a 'public institution' and thus a 'public office' pursuant to R.C. 149.011(A), making it subject to the public records disclosure requirements of R.C. 149.43." Id. at paragraph one of the syllabus. In so holding, we relied on a previous case that did not involve a public-records claim:

{¶ 18} "Under *Halaby* [*v. Bd. of Directors of Univ. of Cincinnati* (1954), 162 Ohio St. 290, 298, 55 O.O. 171, 123 N.E.2d 3] an entity organized for rendering service to the residents of its community and supported by public taxation is deemed a public institution. The Cuyahoga County Hospital System renders a public service to residents of Cuyahoga County and is supported by public taxation. As such, it is a 'public institution' and thus a 'public office' pursuant to R.C. 149.011(A)." *Fox*, 39 Ohio St.3d at 110, 529 N.E.2d 443.

{¶ 19} Based on *Fox*, we have used a three-part test for determining whether a hospital is a public institution—and therefore a public office—for purposes of the Public Records Act. *State ex rel. Stys v. Parma Community Gen. Hosp.* (2001), 93 Ohio St.3d 438, 440, 755 N.E.2d 874. "Thus, if we find that a particular hospital is a public hospital, renders a public service to residents, and is supported by public taxation, we must hold that it is a public office required to disclose its public records." *State ex rel. Fostoria Daily Rev. Co. v. Fostoria Hosp. Assn.* (1988), 40 Ohio St.3d 10, 12, 531 N.E.2d 313.

{¶ 20} In public-records cases involving an entity that is not a hospital, we have applied a two-part test emphasizing the public-service and tax-reliance factors of the *Fox* test. Consequently, "[a]n entity organized for rendering service to residents of the community and supported by public taxation is a public institution." *State ex rel. Freedom Communications, Inc. v. Elida Community Fire Co.* (1998), 82 Ohio St.3d 578, 579, 697 N.E.2d 210, citing *Fox*, 39 Ohio St.3d at 110, 529 N.E.2d 443.

## VI. Functional–Equivalency Test

{¶ 21} In the absence of a precise legislative definition of what constitutes an agency or public office for purposes of public-records acts, some jurisdictions have developed a functional-equivalency test to determine whether particular entities are subject to public-records acts. See *Connecticut Humane Soc. v. Freedom of Information Comm.* (1991), 218 Conn. 757, 759–760, 591 A.2d 395 ("where it is unclear whether a hybrid public/private entity falls within the definition [of 'public agency'], we have interpreted the section to include within its scope an entity that is the functional equivalent of a public agency"); *Burlington v. Hosp. Adm. Dist. No. 1* (2001), 2001 Me. 59, 769 A.2d 857, ¶ 16 ("When determining whether an entity is a public agency or body for purposes of public disclosure laws, other jurisdictions have looked to the function that the entity performs"); *Marks v. McKenzie High School Fact–Finding Team* (1994), 319 Ore. 451, 463, 878 P.2d 417 ("for purposes of construing Oregon's operative term [—"public body" for purposes of the public-records law—] the legislature would have intended this court to apply a 'functional' approach similar to that taken by the federal courts and by the courts of many of our sister states"); *Memphis Publishing Co. v. Cherokee Children & Family Servs.* (Tenn.2002), 87 S.W.3d 67, 79 ("we follow the Connecticut Supreme Court and interpret records 'made or received * * * in connection with the transaction of official business by any governmental agency' to include those records in the hands of any private entity which operates as the functional equivalent of a governmental agency").

{¶ 22} In determining whether a private entity is the functional equivalent of a governmental agency, courts have considered the following nonexhaustive list of factors: (1) whether the entity performs a governmental function, (2) the level of government funding, (3) the extent of government involvement or regulation, and (4) whether the entity was created by the government. See, generally, 1 O'Reilly, Federal Information Disclosure (3d Ed.2000) 68–69, Section 4:11; *Connecticut Humane Soc.*, 218 Conn. at 760, 591 A.2d 395; *Burlington*, 2001 Me. 59, 769 A.2d 857, ¶ 16; *Memphis Publishing*, 87 S.W.3d at 79. At least one court has factored in whether the entity's officers and employees are government officials or government employees. *Marks*, 319 Ore. at 463–464, 878 P.2d 417.

{¶ 23} Applying the functional-equivalency test requires a case-by-case analysis, examining all pertinent factors with no single factor being dispositive. See *Ry. Labor Executives Assn. v. Consol. Rail Corp.* (D.C.D.C.1984), 580 F.Supp. 777, 778 ("All relevant factors are to be considered cumulatively, with no single factor being essential or conclusive"); *Bd. of Trustees of Woodstock Academy v. Freedom of Information Comm.* (1980), 181 Conn. 544, 555–556, 436 A.2d 266 ("A case by case application of the factors noted above is best suited to ensure that the general rule of disclosure underlying the state's [Freedom of Information

Act] is not undermined by nominal appellations which obscure functional realities"); *Memphis Publishing,* 87 S.W.3d at 79 ("In making this determination [whether a private entity is the functional equivalent of a government agency], we look to the totality of the circumstances in each given case, and no single factor will be dispositive").

{¶ 24} Until today, we have not expressly adopted a functional-equivalency test to determine whether an entity is a public institution and thus a public office subject to R.C. 149.43. But we have considered factors similar to the factors in the functional-equivalency test in making the determination. See, e.g., *State ex rel. Toledo Blade Co. v. Univ. of Toledo Found.* (1992), 65 Ohio St.3d 258, 602 N.E.2d 1159, paragraph one of the syllabus ("A private nonprofit corporation that acts as a major gift-receiving and soliciting arm of a public university and receives support from public taxation is a 'public office' pursuant to R.C. 149.011(A), and is subject to the public records disclosure requirements of R.C. 149.43(B)"); *Fostoria Daily Rev.,* 40 Ohio St.3d at 12, 531 N.E.2d 313 ("if we find that a particular hospital is a public hospital, renders a public service to residents, and is supported by public taxation, we must hold that it is a public office required to disclose its public records"); *State ex rel. Dist. 1199, Health Care & Social Serv. Union, SEIU, AFL–CIO v. Lawrence Cty. Gen. Hosp.* (1998), 83 Ohio St.3d 351, 699 N.E.2d 1281 (finding hospital to be a public office for purposes of R.C. 149.011(A) and 149.43 because it rendered a public service to county residents, it was supported by public taxation, its employees participated in the Public Employees Retirement System, and its trustees were appointed by county officials); *Stys,* 93 Ohio St.3d 438, 755 N.E.2d 874 (finding that Parma Community General Hospital Association, a nonprofit charitable corporation, was not a public office, even though public taxes were used to build and equip the hospital, because its board members were not public officers, the association decided the terms and conditions of employment for hospital staff, and the employees were not covered under the Public Employees Retirement System).

{¶ 25} Because the functional-equivalency test is consistent with the persuasive authority from federal and state courts and comports with the test that this court created in *Fox,* 39 Ohio St.3d 108, 529 N.E.2d 443, we adopt it. Thus, we hold that in determining whether a private entity is a public institution under R.C. 149.011(A) and thus a public office for purposes of the Public Records Act, R.C. 149.43, a court shall apply the functional-equivalency test. Under this test, the court must analyze all pertinent factors, including (1) whether the entity performs a governmental function, (2) the level of government funding, (3) the extent of government involvement or regulation, and (4) whether the entity was created by the government or to avoid the requirements of the Public Records Act.

{¶ 26} We further hold that the functional-equivalency analysis begins with the presumption that private entities are not subject to the Public Records Act absent a showing by clear and convincing evidence that the private entity is the functional equivalent of a public office.

VII. Application of Functional–Equivalency Test to Oriana House

A. Governmental Function

{¶ 27} Oriana House controls the day-to-day operations of the Summit County CBCF. The CBCF obtains its operating revenues from ODRC, which is the state agency authorized to "maintain, operate, manage, and govern all state institutions for the custody, control, training, and rehabilitation of persons convicted of crime and sentenced to correctional institutions." R.C. 5120.05. Oriana House, in operating the Summit County CBCF, maintains custody of and provides training and rehabilitative services to convicted criminals, but Oriana House is not a CBCF.

{¶ 28} The administration of prisons has traditionally been a uniquely governmental function. *Oriana House, Inc. v. Montgomery*, 108 Ohio St.3d 419, 2006-Ohio-1325, 844 N.E.2d 323, ¶ 15 ("CBCFs are established by the laws of Ohio to exercise a government function: the operation of facilities and programs for criminal offenders"). See *Mossman v. Donahey* (1976), 46 Ohio St.2d 1, 19–20, 75 O.O.2d 1, 346 N.E.2d 305 (Brown, J., concurring) ("a state activity like the administration of prisons * * * historically has been an exclusive state function under the reserved powers of the Tenth Amendment"). By performing the duties of the Summit County CBCF, Oriana House is performing a historically governmental function.

B. Level of Government Funding

{¶ 29} The fact that a private entity receives government funds does not convert the entity into a public office for purposes of the Public Records Act. See *Freedom Communications*, 82 Ohio St.3d at 580, 697 N.E.2d 210 ("we expressly reject respondents' contention that this result [that the entity in question is a public office for purposes of R.C. 149.43] is tantamount to concluding that *all* private entities entering into government contracts are public offices whose records are subject to disclosure under R.C. 149.43" (emphasis sic)); *Doe v. Adkins* (1996), 110 Ohio App.3d 427, 434–435, 674 N.E.2d 731 (court found no support for "the proposition that a private corporation should be considered a public entity simply because it receives public funding"); *Dow v. Caribou Chamber of Commerce & Industry*, 2005 Me. 113, 884 A.2d 667, ¶ 15 ("The fact that an entity receives a substantial amount of governmental funding is also not sufficient to render that entity a public agency. If this were so, any private organization that received grant money, for example, could arguably be deemed a

public agency"); *Irwin Mem. Blood Bank of the San Francisco Med. Soc. v. Am. Natl. Red Cross* (C.A.9, 1981), 640 F.2d 1051 (receipt of money from government contracts did not make the Red Cross an agency subject to the Freedom of Information Act, absent substantial federal control or supervision of its operations).

{¶ 30} The General Assembly requires the disclosure of certain financial records of organizations with government service contracts. R.C. 149.431 provides:

{¶ 31} "(A) Any governmental entity or agency and any nonprofit corporation or association * * * that enters into a contract or other agreement with the federal government, a unit of state government, or a political subdivision or taxing unit of this state for the provision of services shall keep accurate and complete financial records of any moneys expended in relation to the performance of the services pursuant to such contract or agreement according to generally accepted accounting principles. Such contract or agreement and such financial records shall be deemed to be public records as defined in division (A)(1) of section 149.43 of the Revised Code and are subject to the requirements of division (B) of that section [with certain exceptions]."

{¶ 32} Although R.C. 149.431 does not "otherwise limit the provisions of [R.C.] 149.43," it indicates that the General Assembly recognizes that not every entity that provides services under a government contract is a public office for purposes of the Public Records Act. Nevertheless, the level of government funding is a relevant factor in determining whether an entity is a public office for purposes of the Public Records Act. See *Freedom Communications*, 82 Ohio St.3d at 579, 697 N.E.2d 210 (private, nonprofit corporation, Elida Community Fire Company, was found to be a public office in part due to the level of government funding— almost 97 percent of its funding was from taxes). Oriana House receives 100 percent of the Summit County CBCF's revenues, and in 2001, approximately 88 percent of Oriana House's total revenues came from public sources; the level of government funding is therefore significant.

### C. Extent of Government Involvement or Regulation

{¶ 33} There is no evidence here that any government entity controls the day-to-day operations of Oriana House. See *Stys*, 93 Ohio St.3d at 442, 755 N.E.2d 874 (court found that a hospital association was not a public office, in part because "the cooperating municipalities do not make any of the day-to-day decisions that affect the hospital's operation"). The record clearly establishes that Oriana House is an independent, private corporation.

## D. Creation of Entity

{¶ 34} Oriana House was created as a private, nonprofit corporation. It was not established by a government entity. Further, nothing in the record indicates that Oriana House, which was incorporated prior to the creation of CBCFs, was created as the alter ego of a governmental agency to avoid the requirements of the Public Records Act.

## E. Weighing of Factors

{¶ 35} Even construing R.C. 149.43 liberally in favor of broad access, as we must, *State ex rel. Plain Dealer Publishing Co. v. Cleveland,* 106 Ohio St.3d 70, 2005-Ohio-3807, 831 N.E.2d 987, ¶ 20, we conclude that there is not clear and convincing evidence that Oriana House is a public institution and thus a public office subject to the Public Records Act. Two factors of the functional-equivalency test favor the auditor's position, and two factors favor Oriana House's position. The two factors that favor the auditor's position are not fully in her favor, while the two factors that favor Oriana House are wholly in its favor. After considering the pertinent factors, we conclude that Oriana House is not a public institution.

{¶ 36} A private business does not open its records to public scrutiny merely by performing services on behalf of the state or a municipal government. It ought to be difficult for someone to compel a private entity to adhere to the dictates of the Public Records Act, which was designed by the General Assembly to allow public scrutiny of public offices, not of all entities that receive funds that at one time were controlled by the government. To that end, we adopt the functional-equivalency test as expressed in this opinion.

Judgment reversed.

LUNDBERG STRATTON, O'DONNELL and LANZINGER, JJ., concur.

MOYER, C.J., RESNICK and O'CONNOR, JJ., dissent.

———————

**MOYER, C.J., dissenting.**

{¶ 37} I respectfully dissent. This case, and many that have come before it, is an example of the difficult position in which courts are placed when legislatures adopt statutes that include words that are critical to the application of the statute, but then fail to define those words.

{¶ 38} Whether a record is a public record depends upon whether the record is kept by a public office. R.C. 149.43(A)(1). "Public office" is defined to include a number of designated legal entities. R.C. 149.011(A). Included among them are "institution[s]" and "public institution[s]." Id. The task of determining which

entities fall into those categories has been left to the courts, and this court has done so on a case-by-case basis. Our long line of cases and the majority opinion in this case should convince the General Assembly that it, rather than this court, should define the terms in a manner that would settle the policy issues that are determined each time a court applies the broad statutory language to the facts in individual cases.

{¶ 39} The majority has comprehensively reviewed the jurisprudence relating to the issue. In the absence of a more precise legislative definition of what constitutes a public office subject to public records acts, federal and state courts have developed a "functional equivalency" analysis to determine whether particular entities are subject to these laws. I do not disagree with the majority's transformation of the various iterations of the Ohio test into a functional-equivalency test. I strongly disagree with the conclusion of the majority that application of the functional-equivalency test requires us to reverse the judgment of the court of appeals.

{¶ 40} In the absence of legislative action, the functional-equivalency test is an improvement over the current two- and three-part tests used previously because it provides more detailed guidance for litigants, the public, and the courts.

{¶ 41} In adopting its version of the functional-equivalency test, however, the majority fails to give any guidance as to the appropriate balancing of the different factors. From its application of the test, it appears that the majority believes that in order for an entity to be deemed a public institution under R.C. 149.011(A), all four elements of the functional-equivalency test must support such a conclusion. I disagree with that approach. And others disagree as well. See *Marks v. McKenzie High School Fact–Finding Team* (1994), 319 Ore. 451, 463, 878 P.2d 417 ("no single factor is either indispensable or dispositive"); *Ry. Labor Executives' Assn. v. Consol. Rail Corp.* (D.C.D.C.1984), 580 F.Supp. 777, 778 ("All relevant factors are to be considered cumulatively, with no single factor being essential or conclusive").

{¶ 42} Some courts include additional factors in the functional-equivalency analysis. See *Ry. Labor Executives' Assn.*, 580 F.Supp. at 778–779 ("The following factors are among those most often cited in this analysis: The performance of governmental functions by the entity, the presence of substantial government control over the entity's day to day operations, authority of the entity to make and implement decisions, the nature of the government's financial involvement with the entity, the existence of a federal charter, and the status of the entity's employees"); *Marks*, 319 Ore. at 463–464, 878 P.2d 417 (adding two factors to the list adopted by the majority herein: "The scope of the authority granted to and exercised by the entity" and "[t]he status of the entity's officers and employees").

{¶ 43} I would apply the foregoing analysis of the functional-equivalency test to Oriana House as follows:

{¶ 44} 1. Governmental Function—Under R.C. 1.05, "imprisonment" means being imprisoned under a sentence imposed for an offense. Oriana House performs the day-to-day operations of the Summit County Community–Based Correctional Facility ("CBCF") for Summit County. The CBCF receives all of its operating revenues from a state agency, the Ohio Department of Rehabilitation and Correction. The statutory purpose of the department is to "maintain, operate, manage, and govern all state institutions for the custody, control, training, and rehabilitation of persons convicted of crime and sentenced to correctional institutions." R.C. 5120.05. Oriana House maintains custody of and provides training and rehabilitative services to convicted criminals with public funds that flow from the Department of Rehabilitation and Correction through the Summit County CBCF. There can be no dispute that the administration of prisons has traditionally been a uniquely governmental function. *Mossman v. Donahey* (1976), 46 Ohio St.2d 1, 19–20, 75 O.O.2d 1, 346 N.E.2d 305; *Oriana House, Inc. v. Montgomery*, 108 Ohio St.3d 419, 2006-Ohio-1325, 844 N.E.2d 323, ¶ 15.

{¶ 45} 2. Level of Government Funding—The fact that an entity receives public funds does not necessarily mean that the entity is a public office for purposes of the Public Records Act. *State ex rel. Strothers v. Wertheim* (1997), 80 Ohio St.3d 155, 161, 684 N.E.2d 1239. If the contrary were so, any private organization that receives grant money could arguably be deemed a public office. I would not support such a conclusion, and an affirmance of the court of appeals decision here does not produce such a result. The suggestion by amici that unless the court of appeals decision is reversed, any private contractor receiving funds under contract with a public agency would be deemed a public office is not supported by the opinion of the court of appeals. In fact, under R.C. 149.431, the General Assembly requires a disclosure of only some of the financial records of organizations with government service contracts. R.C. 149.431 provides some indication that the General Assembly recognizes that not all entities providing services under government contracts are public offices for purposes of the Public Records Act.

{¶ 46} Nevertheless, the level of government funding is a relevant factor, and in my view, it should be given more weight than other factors. Oriana House received 100 percent of the Summit County CBCF's revenues—which are all public funds. Eighty-eight percent of Oriana House's total revenues came from public sources. That fact, together with the fact that Oriana House was serving a traditional government function, should be enough to at least permit the State Auditor access to the records of all expenditures of the state funds received by

Oriana House. Oriana House could, of course, seek protection of any records pertaining to use of funds obtained exclusively from private sources.

{¶ 47} Under the majority holding, some of the records of Oriana House are closed to the State Auditor, even though the pages of those records would reveal the manner in which a substantial amount of public funds were expended. A private entity that receives 88 percent of its funding from public sources should not be permitted to keep the public, which provided most of its total revenue, from knowing how those funds were spent.

{¶ 48} 3. Extent of Government Involvement or Regulation—There is no evidence here that any government entity controls the day-to-day operations of Oriana House. However, there is evidence that there was such lack of control on the part of the Summit County Judicial Corrections Board that Oriana House essentially acted as the Summit County CBCF. The president and chief executive officer of Oriana House acted in a dual capacity—he was also the director of the Summit County CBCF. He signed the Summit County CBCF grant application for fiscal years 2002 and 2003 and received the notification from the Ohio Department of Rehabilitation and Correction of its approval of the grant. The Summit County Judicial Corrections Board permitted Oriana House to operate the CBCF without any rules. These facts distinguish this case from previous cases in which we determined that the private entity in question was not a public office. For example, in *State ex rel. Stys v. Parma Community Gen. Hosp.* (2001), 93 Ohio St.3d 438, 755 N.E.2d 874, Parma Hospital was operated by an 18–member board of trustees composed of residents from all of the cooperating municipalities. Id. at 441, 755 N.E.2d 874. The members of the board that operated the hospital were not officers in any of the cooperating municipalities, and that board decided the terms and conditions of employment for hospital staff. Id. Parma Hospital clearly was operated by an independent, private entity.

{¶ 49} As an institution that receives prisoners in the Ohio penal system, Oriana House certainly was required to meet the standards that were created by the Department of Rehabilitation and Correction. R.C. Chapter 5149 and Ohio Adm.Code Chapter 5120.

{¶ 50} 4. Whether the Entity was Created by the Government—Oriana House was created as a private, nonprofit corporation. I would give that factor very little weight in the context of this case. Surely even the majority would not hold that a private entity that receives all of its funds from public sources is not a public office. Again, the focus of the test should be upon the importance of public funds to the purposes and work of the private entity. Although not suggested here, we should not permit private entities to be created to perform traditional government functions and then permit them to keep from public view the expenditures of public funds.

{¶ 51} If we balance the four factors of the functional-equivalency test, the evidence establishes that Oriana House is a public institution and, thus, is subject to the Public Records Act. Oriana House performs all of the duties of the Summit County CBCF, a public office, in return for all of the revenues provided by the Department of Rehabilitation and Correction for the CBCF. Oriana House performs these historically governmental functions with seemingly no oversight by the Summit County Judicial Corrections Board and while its president simultaneously performed the role of director of the CBCF during much of the time in question.

{¶ 52} Under these circumstances, and given our duty to resolve any doubts regarding the public status of an entity so as to find it subject to R.C. 149.43, Oriana House acts as the functional equivalent of a public office.

{¶ 53} I agree with the observation of the Tennessee Supreme Court in *Memphis Publishing Co. v. Cherokee Children & Family Servs., Inc.* (2002), 87 S.W.3d 67, 79: "A private business does not open its records to public scrutiny merely by doing business with, or performing services on behalf of, state or municipal government. But when an entity assumes responsibility for providing public functions to such an extent that it becomes the functional equivalent of a governmental agency, the * * * Public Records Act guarantees that the entity is held accountable to the public for its performance of those functions."

{¶ 54} The court of appeals correctly held that Oriana House is a public office subject to the Public Records Act, and its judgment should be affirmed.

RESNICK and O'CONNOR, JJ., concur in the foregoing dissenting opinion.

———————

Benesch, Friedlander, Coplan & Aronoff, L.L.P., Orla E. Collier III, and Frank J. Reed Jr., for appellant.

Jim Petro, Attorney General; and Isaac, Brant, Ledman & Teetor, L.L.P., Mark Landes, and Mark H. Troutman, for appellee.

Collis, Smiles & Collis, L.L.C., and Terri-Lynne B. Smiles, urging reversal for amici curiae Corporation for Ohio Appalachian Development, Ohio Association of Nonprofit Organizations, Ohio Hospital Association, Association of Ohio Philanthropic Homes, Housing and Services for the Aging, Ohio Association of Community Action Agencies, the Betty Jane Center, the Ohio Association of Second Harvest Foodbanks, the Ohio Association of Child Caring Agencies, Ohio Partners for Affordable Energy, the Center for Community Solutions, the Action Ohio Coalition for Battered Women, the Now Education and Legal Fund, the Association for Children for Enforcement of Support, the Ohio Head Start Association, Coalition on Homelessness and Housing in Ohio, Envirotest Systems Corporation, Ohio United Way, and United Rehabilitation Services of Greater Dayton.

Bricker & Eckler, L.L.P., and Quintin F. Lindsmith, urging reversal for amicus curiae Ohio Community Corrections Association.

Roetzel & Andress, L.P.A., and Thomas L. Rosenberg, urging reversal for amicus curiae Ohio Domestic Violence Network.